IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

vs.                                                                                                      1:21-cr-01496-KWR-1

ELIAS LUCAS GALLEGOS,

      Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Suppress Evidence and Identification (Doc. 42). The Court held an evidentiary hearing on September 1, 2022. Having reviewed the pleadings and heard oral argument and testimony at the hearing, the Court finds that Defendant's motion is not well taken, and therefore, is **DENIED**.

### BACKGROUND[1]

On September 17, 2021, Mr. Gallegos allegedly assaulted John Doe in Albuquerque, New Mexico. Mr. Doe was on official duty as a Letter Carrier for the U.S. Postal Service ("USPS"). Mr. Doe parked his USPS vehicle on 4529 Altura Place NE and delivered mail wearing his USPS uniform. Mr. Doe walked east on Constitution Avenue NE and noticed Mr. Gallegos walking about 30 feet ahead of him. For approximately ten minutes, Mr. Doe continued to deliver mail as he traveled east in the same direction as Mr. Gallegos. Mr. Gallegos was not walking in a straight line and would avoid residential driveways. Mr. Doe thought Mr. Gallegos might be under the influence. Mr. Gallegos crossed the street at the crosswalk and became

---

[1] The Court is not making factual findings related to Defendant's conduct on the underlying charge in this Memorandum Opinion and Order.

distracted by an item on the ground. Mr. Gallegos knelt to look at the item. Mr. Doe, continuing his mail route in the same direction as Mr. Gallegos, approached Mr. Gallegos from behind. Mr. Gallegos became startled and pulled a knife on Mr. Doe. Mr. Doe looked at Mr. Gallegos face for 5-10 seconds before turning his attention to the two to three inch blade. Mr. Gallegos told Mr. Doe to turn around. Mr. Doe followed the order and began to quickly walk away. There were no other people on the street or block. Mr. Doe looked over his shoulder and saw Mr. Gallegos running towards him with the knife. As a result, Mr. Doe ran up Monroe Street NE. Mr. Doe eventually stopped and looked back to see if Mr. Gallegos was still following him. Mr. Gallegos had stopped. Mr. Gallegos grabbed a cobblestone about baseball size from the ground and threw it towards Mr. Doe. Mr. Doe moved to avoid the cobblestone.

Mr. Doe returned to his USPS vehicle. Within 30 seconds after the assault, at 12:56PM, Mr. Doe called 911 and provided a detailed description of the incident. He described Mr. Gallegos as wearing a yellow sweater and dark blue baggy pants, Hispanic, 5'9, late 20s or early 30s, about 170-180 pounds, potentially on drugs, and armed with a knife.

Albuquerque Police Department ("APD") Sergeant Richard Whitten was on patrol in official uniform displaying his badge and driving a marked police unit when he heard the description of the suspect on his radio. At 1:08PM or 1:09PM, Sgt. Whitten spotted Mr. Gallegos within a half mile or less of the alleged incident. Sgt. Whitten noticed Mr. Gallegos because he was wearing a yellow sweater in mid 80s-to-90-degree weather. Sgt. Whitten called over the radio that he observed a suspect matching the 911 description. Officers Charles Sanchez and Jared Foulk arrived on the scene. Sgt. Whitten and his fellow officers initiated emergency equipment on their patrol cars, including lights and sirens. Officer Foulk stated, "Stop Police." Mr. Gallegos fled on foot. Mr. Gallegos ran towards a neighborhood. He ran through a backyard

and then into an alley. From the alley, he went into a second backyard and hid in a shed. Sgt. Whitten briefly lost sight of Mr. Gallegos as he ran through a yard, but he saw Mr. Gallegos again in the alley.

The officers set up a parameter around the private residence and backyard. Officers contacted Jay Stanke, the owner of the residence. Mr. Stanke did not know Mr. Gallegos and did not give him permission to enter his backyard or his shed. Sgt. Whitten approached the fence. Mr. Gallegos exited the shed, no longer wearing the yellow sweater, and officers gave him verbal commands. Mr. Gallegos disregarded the commands and walked towards the backdoor of the house. Believing Mr. Gallegos to be armed with a knife, Sgt. Whitten fired a 40 mm sponge tipped projectile at Mr. Gallegos, striking him in the upper back. Sgt. Whitten continued to engage in about a 20-minute contentious dialogue with Mr. Gallegos. Mr. Gallegos argued that he had permission to be in the yard and gave the false name "Yoshi." Eventually, Mr. Gallegos cooperated and turned himself into the officers. Postal Inspector Corina Castro received permission from the Mr. Stanke to search the shed. Ms. Castro found a knife and a torch lighter in the shed

At 1:20PM, APD Sergeant Sean Higdon arrived at Mr. Doe's location. Mr. Doe told Sgt. Higdon about the assault and provided a description of Mr. Gallegos, which matched the description he provided to the 911 operator. At about 2:00PM, Officer Eric Wilensky arrived at Mr. Doe's location and transported Mr. Doe to determine if Mr. Gallegos was the same person that threatened him with a knife. Mr. Doe remained in the patrol car while he observed Mr. Gallegos. Mr. Doe positively identified him. Mr. Gallegos was handcuffed, not wearing a yellow sweater, and surrounded by police.

## DISCUSSION

**I. <u>Defendant does not have standing to challenge the search of the shed.</u>**

For the first time at the evidentiary hearing, Defendant contested the search of the shed. Based on the lack of notice, the Court offered the Government additional time to brief this issue. The Government declined and argued that Defendant does not have standing to challenge the search of the shed. The Court finds that Defendant has no possessory interest in the shed. Defendant has no subjective expectation of privacy nor is the expectation of privacy reasonable. Therefore, the Court finds that Defendant does not have standing to challenge the search of the shed.

"A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own constitutional rights have been violated." *United States v. Rubio–Rivera,* 917 F.2d 1271, 1274 (10th Cir.1990). To demonstrate in the context of a search, the defendant must show that he had a subjective expectation of privacy in the premises searched and that "society is prepared to recognize that expectation as reasonable." *United States v. Conway,* 73 F.3d 975, 979 (10th Cir.1995).

When the defendant offers "sufficient evidence indicating that he has permission of the owner to use the [property], the defendant plainly has a reasonable expectation of privacy in the [property] and standing to challenge the search of the [property]." *Rubio–Rivera,* 917 F.2d at 1275. Offering "sufficient evidence" does not require that a defendant must present formal, documented proof of ownership or legitimate possession in order to have standing. *United States v. Arango,* 912 F.2d 441, 445 (10th Cir. 1990). However, a defendant must, "at least state that he gained possession from the owner or someone with the authority to grant possession." *Id.*

4

Defendant has not provided sufficient evidence indicating that he had permission to use the shed. Mr. Stanke testified that he owned the shed and did not give Mr. Gallegos permission to use the shed. Mr. Stanke did not know Mr. Gallegos when he entered his property and was not aware of Mr. Gallegos' name. The Court concludes that Mr. Gallegos does not have any possessory interest in the shed. Mr. Gallegos does not own the shed, and he did not receive permission from Mr. Stanke to use the shed. Therefore, Mr. Gallegos did not have a subjective expectation of privacy in the shed nor is his expectation of privacy reasonable. The Court finds that Defendant does not have standing to challenge the search of the shed.

## II. **Defendant was reasonably searched and seized in an investigative detention.**

Defendant argues that Mr. Gallegos' arrest, identification, and in-court identification be suppressed because officers did not have reasonable suspicion or probable cause when officers seized Mr. Gallegos. Doc. 42 at 4, 11. Government argues that Defendant failed to identify the evidence he is seeking to suppress. Doc. 49 at 3 n.4. Nonetheless, the Government further argues that the search and seizure was reasonable. *Id.* at 5, 7-8. The Court finds that the search and seizure of Mr. Gallegos was in fact reasonable and not a violation of his Fourth Amendment rights.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has identified three types of police encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions," otherwise known as *Terry* stops, "which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by

5

probable cause." *United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009) (citation omitted).

Because these facts involve a warrantless search, "the government bears the burden of proving the reasonableness of a search or seizure." *United States v. Kitchell*, 653 F.3d 1206, 1215 (10th Cir.2011) (citation omitted). When considering a motion to suppress, "the credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.2009) (citation omitted).

An investigative detention stop occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In deciding whether a police encounter rises to the level of an investigatory stop, the Court must determine "whether a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (brackets, internal quotation marks, and citations omitted).

"Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012). Reasonable suspicion requires "considerably less" than preponderance of the evidence and "obviously less" than probable cause. *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019); *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.") (quoting *United States v. Sokolow*, 490 U.S. 1, 7

(1989)). Reasonable suspicion may exist even if it is more likely than not the individual is not involved in criminal activity. *See Gurule*, 935 F.3d at 885. It is not meant to be an onerous standard. *See United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). It merely requires that "officers develop a particularized and objective basis for suspecting an individual may be involved in criminal activity." *Id.* at 1379–80. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Oliver*, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).

### A. Defendant was seized at the time he left the shed and was hit with a 40 mm sponge-tipped projectile.

Defendant argues that the seizure occurred when officers pursued Mr. Gallegos in their patrol cars. Doc. 42 at 6. The Government argues that Mr. Gallegos was not seized at the pursuit of the patrol cars because Mr. Gallegos fled on foot. Doc. 49 at 5. The Government argues that Mr. Gallegos was seized when he emerged from the shed and was hit with a 40 mm sponge tipped projectile. Doc. 49 at 5. The Court agrees with the Government.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... as long as the police do not convey a message that compliance with their requests is required." *Id.* at 434–35. Thus, "[a] seizure occurs for Fourth Amendment purposes when 'a reasonable person would have believed that he was not free to leave.' " *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). This assessment is based on "what a reasonable, law-abiding person would have thought had he been

7

in the defendant's shoes," and not based on "what the defendant himself thought." *United States v. Tafuna*, 5 F.4th 1197, 1200 (10th Cir. 2021).

In assessing whether a reasonable person in the defendant's position would have felt free to leave, a court takes a holistic "totality-of-the-circumstances" approach. *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). Factors to consider include:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; ... (8) absence of other members of the public ... [; and (9)] whether an officer indicated to the person that he is free to leave.

United States v. Jones, 701 F.3d 1300, 1313 (10th Cir. 2012) (internal quotation marks omitted). This list of factors "is not exhaustive," and "no single factor is dispositive." *Id.* But "the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (quotation marks omitted).

The Court finds that Mr. Gallegos was seized at the time he left the shed and was hit with 40 mm sponge-tipped projectiles. While the Supreme Court has recognized that "the very presence of a police car driving parallel to a [ ] pedestrian could be somewhat intimidating," the presence of police cars alone is not enough to constitute a seizure. *Chesternut*, 486 U.S. at 575. "[W]hen [a] police officer[ ] pursue[s] a citizen in their squad car while the citizen is on foot, courts will consider whether the officer[ ] activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his

movement, displayed their weapons, or commanded the citizen to halt." *Id.* at 1264. An officer shining a bright, non-emergency light at an individual "is not inherently coercive." *Tafuna,* 5 F.4th at 1201 (collecting authority on this point and noting that an opposing rule would place officer safety at risk when approaching a vehicle or individual at night).

Here, Officer Foulk activated sirens, stepped out of his police car, and ordered Mr. Gallegos to stop. Mr. Gallegos immediately fled. Multiple officers activated sirens and lights and operated their patrol cars to follow Mr. Gallegos. Govt. Exh. 4 at 2:35-3:46. However, the officers were unable to block Mr. Gallegos' course or control his direction. Mr. Gallegos fled on foot through a residential area. He ran across numerous yards and hopped over fences into backyards where patrol cars were unable to pursue. *Id.* at 3:54-3:58, 4:50-5:12. The Tenth Circuit has remained consistent that when a suspect "continues to flee[,] [there] is no seizure." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Mosley*, 743 F.3d 1317, 1327 (10th Cir. 2014) (holding no seizure when in response to officers raising their weapons and shouting "hands up", suspect made furtive motions in retrieving a gun); *United States v. Roberson*, 864 F.3d 1118, 1125 (10th Cir. 2017) (holding no seizure when suspect made furtive stuffing motions when officer approached his car with bright lights); *United States v. Harris*, 313 F.3d 1228, 1235 (10th Cir. 2002) (holding no seizure when after multiple request for identification, suspect ignored demands and walked past the officer); *United States v. Salazar*, 609 F.3d 1059, 1067 (10th Cir. 2010) (holding no seizure when suspect reversed his truck after a patrol car stopped in from of him). The Court is reminded of *United States v. Jeffers*, where Jeffers ignored officers' emergency lights and set off a lengthy chase. No. 21-6017, 2022 WL 321128, at *2 (10th Cir. Feb. 3, 2022). The Tenth Circuit held that Jeffers was not seized until after being tased because before that point Jeffers was still attempting to escape. *Id.*

Here, Defendant fled from the officers in their patrol car, and even after he left the shed, Defendant continued to ignore officers' commands and moved towards the private residence. Govt. Exh. 4 at 23:20-23:44. It was not until after Sgt. Whitten fired the 40 mm sponge tipped projectile did Mr. Gallegos no longer make efforts to escape. *Id.* at 23:44-25:00. Therefore, the Court finds that Defendant was seized after he left the shed and was hit with 40 mm sponge tipped projectile.

### B. Officers had reasonable suspicion to seize Defendant.

Defendant argues that officers did not have reasonable suspicion at the point of the seizure because of the generic description of the suspect. Doc. 42 at 7. The Government agrees that the 911 call description of the suspect was too general to support reasonable suspicion by itself. However, the description, the corroboration of the description within minutes of the dispatch, and Mr. Gallegos' flight established reasonable suspicion. Doc. 49 at 7-8. Additionally, the Government argues that the officers had reasonable suspicion because Mr. Gallegos flight meant he violated NMSA § 30-22-1 (resisting or evading). Doc 49 at 8. The Court finds that the officers had reasonable suspicion when Mr. Gallegos was seized.

In assessing whether an officer had reasonable suspicion, the Court "must look at the totality of the circumstances of [the] case." *Kitchell*, 653 F.3d at 1218. "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *Sokolow*, 490 U.S. at 7). Stated as an affirmative standard, to conduct an investigatory stop, "an officer must have a particularized and objective basis for suspecting an individual may be involved in criminal activity." *United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018) (internal quotation marks omitted). "Although the government bears the burden of proving the

reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard." *Kitchell*, 653 F.3d at 1219 (internal quotation marks and citation omitted). "In deciding whether the government has met its burden of showing reasonable suspicion, we judge the officer's conduct in light of common sense and ordinary human experience and we accord deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (internal quotation marks and citations omitted); *see also United States v. Pettit*, 785 F.3d at 1379 ("We defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions.").

The "particularized and objective basis" threshold does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Kitchell*, 653 F.3d at 1218–19. "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *Pettit*, 785 F.3d at 1374, 1379 (quotation marks omitted). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." *Id*. at 1379–80 (emphasis in original) (internal quotation marks omitted).

Here, officers had reasonable suspicion to seize Mr. Gallegos in an investigative detention. Sgt. Whitten located an individual that matched Mr. Doe's description within minutes of the dispatch and a half mile or less from the location of the assault. While this alone arguably may not have been enough to establish reasonable suspicion, Mr. Gallegos fled when officers approached him. The Tenth Circuit has held that flight can create reasonable suspicion. *United*

*States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir. 2013) ("Flight can create reasonable suspicion that the person fleeing is involved in criminal activity." (emphasis omitted)); *United States v. Gates*, No. 20-4106, 2021 WL 6060974, at *6 (10th Cir. Dec. 20, 2021) (holding that a series of evasive actions can create reasonable suspicion). Defendant argues that the flight may have been unrelated to the earlier assault. Doc. 46 at 7. There may have been an innocent explanation for Mr. Gallegos' conduct, but the officers did not have to rule out innocent conduct to have reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002). Even if Mr. Gallegos' conduct was "ambiguous and susceptible of innocent explanation," it was objectively reasonable for officers "to detain [him] to resolve the ambiguity." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). The Court finds that officers had reasonable suspicion to seize Mr. Gallegos because Mr. Gallegos matched Mr. Doe's description, fled, and made a series of evasive maneuvers.

If the officers did not have enough reasonable suspicion to detain him for the alleged assault, officers certainly had reasonable suspicion to detain him for violating NMSA § 30-22-1, which states "whoever commits resisting, evading or obstructing an officer is guilty of a misdemeanor." NMSA § 30-22-1. The Court finds that Mr. Gallegos evaded officers, and thus, officers had reasonable suspicion to detain him.

### C. Officers did not use excessive force.

Defendant further argues that Mr. Gallegos was subject to excessive and unreasonable force when hit with a 40 mm sponge-tipped projectile. Doc. 42 at 8. The Government argues that Sgt. Whitten did not use excessive force because Mr. Gallegos was possibly armed with a knife and appeared to be entering an occupied residence. Doc. 49 at 9. The Court finds that Sgt. Whitten did not use excessive force.

12

When a plaintiff alleges an officer used excessive force to arrest, "the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Courts consider excessive force claims under the balancing test from *Graham v. Connor*, 490 U.S. 386 (1989), which delineates "three, non-exclusive factors": "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher v. Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (quoting Graham, 490 U.S. at 396).

Sgt. Whitten did not use excessive force under the *Graham* balancing test. 490 U.S. 386. Sgt. Whitten used a non-lethal 44 mm sponge tipped projectile. Mr. Gallegos' crime at issue was assault against a federal officer using a deadly weapon. Sgt. Whitten believed Mr. Gallegos still had a knife on his person. Mr. Gallegos had chosen to hide in the backyard of a private residence. While Sgt. Whitten fired the projectile 30 seconds after Mr. Gallegos had exited the shed, Mr. Gallego was ignoring the command and walking towards the private residence. Govt. Exh. 4 23:20-23:44. Sgt Whitten was under the impression that Mr. Gallegos may have a knife on his person could pose an immediate threat to the safety of the officers and the private resident in the home. Mr. Gallegos was also actively resisting arrest and attempting to flee after officers commanded him to remain in place. Based on each of the *Graham* factors, Sgt. Whitten used appropriate force to subdue Mr. Gallegos.

### III. **The identification procedure was unnecessarily suggestive, but the identification was sufficiently reliable.**

Defendant argues that identification should be suppressed because the identification procedures were unduly suggestive and not sufficiently reliable. Doc. 42 at 12-13. Defendant

argues the identification is not reliable because the interaction "likely lasted seconds", the knife caused fear and stress, and Mr. Doe was 20-30 feet away. *Id.* at 13. The Government agrees that the identification procedures were unnecessarily suggestive. However, the identification was not unreliable. Doc. 49 at 11-12. Mr. Doe had opportunity to view Mr. Gallegos in broad daylight, faced him directly, and provided a thorough description to the police. *Id.* at 14-15. There was also a short interval of time between the attack and the identification. *Id.* at 15.

The Supreme Court has developed a two-prong test for deciding whether to suppress allegedly unreliable eyewitness identifications. First, the court asks whether law enforcement's challenged identification procedures were impermissibly suggestive. If so, the court must then determine whether the resulting identification is "nevertheless reliable in view of the totality of the circumstances." *United States v. Sanchez*, 24 F.3d 1259, 1261-1262 (10th Cir. 1994). "When a pretrial identification occurs under impermissibly suggestive circumstances and the in-court identification of the witness is unreliable, the identification should be excluded." *Snow v. Sirmons*, 474 F.3d 693, 720 (10th Cir. 2007).

Because "reliability is the linchpin in determining the admissibility of identification testimony," *Mason v. Brathwaite*, 432 U.S. 98, 114 (1977), an identification procured through unnecessarily suggestive means is still admissible if it is sufficiently reliable. *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000). The reliability of an identification is evaluated under the totality of the circumstances to determine whether the suggestive procedure "created a substantial likelihood of irreparable misidentification." *Id.* (quoting *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)). "Short of that point, such evidence is for the jury to weigh" because "evidence with some element of untrustworthiness is customary grist for the jury mill.

Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Brathwaite*, 432 U.S. at 116.

Courts evaluate the reliability identification evidence under the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). The Court evaluates: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

The Government does not dispute, and the Court agrees, that the identification procedure was unnecessarily suggestive. The issue at hand is whether the identification is still sufficiently reliable to outweigh the suggestive procedures. Based on the *Biggers* factors, the identification was not so unreliable as to create a "substantial likelihood of irreparable misidentification." *Bredy*, 209 F.3d at 1195.

Mr. Doe had opportunity to view the Defendant with a high degree of attention. Mr. Doe was aware of Mr. Gallegos' appearance prior to the assault. Mr. Doe "noticed [Mr. Gallegos] couldn't walk straight" and observed Mr. Doe for about ten minutes prior to the assault. Govt. Exh. 2. at 4:10-4:20. Mr. Doe described how Mr. Gallegos would avoid driveways. *Id.* Additionally, Mr. Doe faced Mr. Gallegos in broad daylight about 20 or 30 feet away. While Mr. Doe admitted that his attention was on the knife, Mr. Doe had a direct view of Mr. Gallegos for ten minutes prior to the assault, during the assault he saw his face for about 5-10 seconds, Mr. Doe had a clear view of Mr. Gallegos when he looked back to see if Mr. Gallego was following him, and Mr. Doe had additional time to view Mr. Gallego when Mr. Doe avoided the cobblestone.

Mr. Doe also remained consistent and accurate about his description of Mr. Gallegos. On the 911 call, Mr. Doe described the suspect as wearing a yellow sweater and dark blue baggy pants, Hispanic, 5'9, late 20s or early 30s, about 170-180 pounds, and potentially on drugs. Govt. Exh. 1. Mr. Doe repeatedly and similarly described the suspect when an officer arrived at the scene. Mr. Doe stated that Mr. Gallegos "was wearing a yellow sweater, really baggy blue pants, I think Hispanic." Govt. Exh. 2 at 3:01-3:57. He went further, describing his hair like a seventies afro, curly and not heavy set. *Id.* Mr. Doe's description remained consistent in his written statement to the Postal Inspector. Govt. Exh. 6. Mr. Doe described the suspect as "male Hispanic, appeared to be about 5'9'', 180 lb. Curly dark hair. Wearing yellow sweater, skinny." *Id.* Mr. Doe's description also accurately matched Sgt. Whitten's description – a suspect wearing a yellow sweater and dark blue jogging pants. Furthermore, when Mr. Doe saw Mr. Gallegos, he confirmed nearly immediately that he was the person in the allege assault. Govt. Exh. 3 at 8:02-8:15. When asked if he was a hundred percent certain, Mr. Doe answered, "Yes." *Id.* Finally, the length of time between the crime and the confrontation was short. It occurred in the same day. Mr. Doe testified that he called 911 at 12:56PM, an officer arrived at 1:20PM, another officer arrived at 2:00pm for Mr. Doe to identify the Mr. Gallegos.

Mr. Doe testified that it was difficult to recognize Mr. Gallegos in the Courtroom. However, Mr. Doe went on to explain why it was difficult. Mr. Doe testified that it has been almost a year and Mr. Gallegos currently had shorter hair and lighter skin. Based on Sgt. Higdon's lapel tape, Mr. Gallegos had longer hair and darker skin the day of the alleged incident. Govt. Exh. 2 at 33:20-33:44. Therefore, Mr. Doe accurately noted the changes in Mr. Gallegos appearance in the Courtroom.

After weighing the *Biggers* factors and the corruptive weight of the suggestive procedures, the Court finds that, under the totality of the circumstances, Mr. Doe's identification of Mr. Gallegos is sufficiently reliable to be admitted at trial despite the suggestiveness of the identification procedures the officers.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (**Doc. 42**) is **DENIED**.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE